**Joan C. GORHAM, Plaintiff,**

v.

**AMERICAN TELEPHONE AND TELEGRAPH COMPANY, Defendant.**

Civ. No. 89–1740 (CSF).

United States District Court, D. New Jersey.

Feb. 4, 1991.

Carolyn E. Wright–Bing, Newark, N.J., for plaintiff.

John J. Hopkins, AT & T, Morristown, N.J., for defendant.

## OPINION

CLARKSON S. FISHER, District Judge.

Before this court is a motion for summary judgment by defendant, American Telephone and Telegraph Company, Inc. ("AT & T"), against plaintiff, Joan C. Gorham. Gorham brought suit against AT & T alleging age, race and sex discrimination claims under 42 U.S.C. § 1981 of the Civil Rights Act of 1966; the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et. seq. ("ADEA"), and the New Jersey Law Against Discrimination, N.J.S.A. 10:5–12 ("NJLAD"). AT & T claims that Gorham has no cause of action under § 1981 and that she has failed to meet her prima facie case under the ADEA and the NJLAD. For the following reasons, defendant's motion for summary judgment will be granted.

## FACTS

Plaintiff is a black female over the age of 40. She was hired by AT & T in 1963 as a Clerk and worked her way up to District Manager in 1978. In November of 1985, plaintiff began reporting to Richard Dennis, Director of EEO/Affirmative Action at AT & T. Dennis assigned plaintiff to the project of interviewing high-level officers and managers of AT & T to ascertain the degree of EEO/AA awareness in the corporation. This assignment entailed conducting the interviews, organizing the comments, summarizing the results and making recommendations. The project came to be known as "New Initiatives for a Changing AT & T" ("New Initiative study"). In addition to plaintiff, there were three other employees primarily assigned to this project.

The New Initiative study was warmly received and Dennis praised the work of all the employees involved, including plaintiff. Dennis Dep. at 23; Exhs. 1, 2 and 3. He gave her a Superior appraisal, a rating between Outstanding and Good. Gorham Dep. 4/10/90 at 129–30.

After the completion of the study, in March, 1987, Dennis assigned plaintiff to Bernard Daleske, Division Manager, EEO/AA, advising that the company needed her in that position to effectuate certain of the New Initiative study's recommendations. Gorham Dep. 1/16/90 at 118–19. While under Daleske, plaintiff was placed in charge of ten subordinates of the first and second management levels. Three months later, in June, 1987, Daleske received a note that had been left earlier that day under his office door from the subordinates of Joan Gorham complaining about

her style and management.[1] Daleske Dep. at 19–20. At a meeting Daleske organized to discuss the problems, he was handed yet another and more extensive memorandum containing complaints about plaintiff. This was signed by nine of plaintiff's ten subordinates. Exh. 5; Daleske Dep. at 22–4. Of the signers, one was black and one was Hispanic, seven were female, and four were in the age-protected category. Gorham Dep. 1/16/90 at 39–42; 4/10/90 at 27–28. Part of the text of that letter is as follows:

> We are asking that you evaluate the situation with the skill you have nurtured as a manager. We are asking that Joan be repositioned in an environment which will be beneficial to her, but one that excludes a staff of subordinates.

AT & T claims that Daleske met with plaintiff and presented the June 24 memo to her, and that she denied that it accurately portrayed the situation. Daleske Dep. at 26–7; Exh. 5, p. 1.

On September 3, 1987, plaintiff's subordinates left another note with the Director, Richard Dennis. This note implored Dennis to become involved personally by moving plaintiff out of the organization and stated that employees were leaving the group because of plaintiff. Exh. 6. AT & T claims that Dennis met soon after with Daleske to consider using an outside consultant to assist in resolving the problem. Plaintiff contends she initiated the idea of a consultant and that AT & T denied her the use of same while providing another with a consultant. AT & T claims the plaintiff's subordinates, fearing retaliation by plaintiff, decided they did not want to meet with her and a consultant, and instead some chose to leave the group. Daleske Dep. at 37–39.

Daleske recounted the situation, including discussions with plaintiff's subordinates and their stated reasons for not choosing to meet with the consultant, in Exhibit 7.

Although plaintiff disputes it, her annual evaluation for 1987, completed by Daleske and approved by Dennis, confirmed the difficulty with her subordinates. Exh. 8. For example: "Aspects of Ms. Gorham's management style served as a source of conflict between her and members of her organization. This fact accounts for her reduced level of involvement in various areas of responsibility." By this time four of plaintiff's subordinates had already abandoned the group.

In November 1987 the company reorganized the entire Human Resources organization. Dennis moved to another directorate, and Miss Doreen Yochum was appointed to the newly-created position of Director of Quality in Career Systems within the Human Resources organization. Yochum Dep. at 9. Her responsibilities included the EEO and Affirmative Action work and the development of a Quality Plan for Career Planning and Development Services. Plaintiff requested and obtained a meeting with Yochum, and in February 1988 plaintiff was assigned to a District Manager position reporting to Yochum despite advice from Dennis to Yochum that Gorham was not promotable. Yochum Dep. at 46–48. Plaintiff's new responsibilities required her to work with various other parts of the Human Resources Organization.

Later that same month, February 1988, Yochum received complaints about plaintiff from various individuals in the organization, including a two-page letter from Jeannette Galvanek, detailing the negative feedback about plaintiff. *Id.* at 59–63, Exh. 9. She stated that plaintiff's work efforts were disorganized and poorly prepared, displayed a lack of inner personnel skills and reflected an inflated view of her own effectiveness and an overall poor judgment. Yochum advised plaintiff that employees had lodged complaints about her work performance. Gorham Dep. 1/24/90 at 165–

---

1. The note read as follows:
 Bernie:
 Please do something about Joan Gorham and the way she is ruining our group. We are all looking for other assignments, but we don't really want to leave you or Dick. Please meet with us privately or as a group to hear our views. Exh. 4.

 Your employees.

67; Yochum Dep. at 61, 63. In fact, Yochum's superior, William F. Buehler, Group Vice President of Human Resources, stated at deposition that a group of managers in Human Resources met with him and complained bitterly about plaintiff's management style and supervisory traits. Buehler Dep. at 19–21.

In March 1988, Yochum placed the Division Manager, Lex McCusker, in charge of giving direct assignments to plaintiff because Yochum felt that plaintiff needed hands-on supervision and assignments that were more measurable in nature. Yochum Dep. at 33, 35–36. McCusker assigned plaintiff three tasks from March to early July 1988. He estimated that the time required to perform the three tasks was a total of six days; and he recounted at deposition that plaintiff had not accomplished even one in six weeks. Exh. 10.

On June 21, 1988, McCusker sent a memorandum to plaintiff regarding her Quality Newsletter and Quality Library assignments he had given her. Exh. 12. This document criticized plaintiff's performance in several important areas. For example, she had failed to speak with other company employees, as McCusker had previously directed her to do. Plaintiff contends that McCusker never told her she was to report to McCusker and that they were peers. Gorham Aff. at Para. 14. AT & T contends that she conceded that McCusker, a Division Manager, was higher in the AT & T echelon than she and that Director Yochum had instructed her to perform Quality–related tasks which McCusker assigned to her and that she was obligated to perform those assignments.

On July 5, 1988, Yochum met with plaintiff. Daleske attended the first half of the meeting to discuss plaintiff's 1987 appraisal. McCusker attended the second half to discuss plaintiff's performance in 1988. Gorham Dep. 1/24/90 at 126–27. Yochum documented the meeting in a detailed memorandum to the file, as did Daleske and McCusker. Exhs. 14, 15 & 16. Plaintiff contends not to remember these discussions very well.

When McCusker left, Yochum and plaintiff continued the meeting, and plaintiff recalls very little of that conversation as well. Plaintiff claims that Yochum gave her a ninety-day termination notice at that time, accompanied by the bare statement that "the company didn't need employees like me." Gorham Dep. 1/24/90 at 159–60. Plaintiff interpreted the remark as racial due to Yochum's tone of voice. Plaintiff admits, however, that Yochum never made any derogatory statement to her regarding race, age or sex. Gorham Dep. 4/20/90 at 19; 1/24/90 at 159.

Yochum instructed plaintiff to spend sixty days to find another assignment within the company, since her performance had been unsatisfactory. After sixty days, Yochum told plaintiff, they would discuss the next step. Yochum claims she did not state that the company "didn't need employees like you." Yochum Aff. Para. 10. She also advised plaintiff that if she were unsuccessful in locating a position inside AT & T the company would then provide out-placement services to find a job either inside or outside the company. She also stated that no decision had been made whether plaintiff would be placed inside or outside the company and further testified that the reasons for this action were Gorham's inability to understand her work, her failure to execute work properly, and her refusal to perform certain tasks assigned by McCusker. Yochum Dep. at 65.

Shortly after the July 5, 1988, meeting, plaintiff applied for and was placed on disability leave. Gorham Dep. 1/16/90 at 19. She remained on that status until December 5, 1988, when two company physicians found her capable of returning to work. Exh. 17. She then requested and was placed on vacation status. Exh. 18.

Some time during the fall of 1988, AT & T decided to eliminate a work-force surplus. Yochum Dep. at 51–52. Daleske and Yochum decided that there were too many people in the Human Resources organization and that elimination was necessary to meet the impending company-wide budget. Plaintiff admitted that in 1987 the Dennis

organization contained "just too many people." Gorham Dep. 1/17/90 at 41–42.

Under the AT & T Force Management Guidelines ("FMG"), a management team establishes a new design for the department or organization, then ranks or bands the effective employees based upon individuals' skills, abilities and flexibility for the newly-designed organization. They then ascertain the minimum number of positions which will be eliminated, and then the company solicits volunteers who wish to leave the company in return for a termination payment. If the number of volunteers equals or exceeds the minimum number of eliminated positions, there are no involuntary terminations. If the volunteers are fewer, involuntary separations are made, starting with the lowest band, until the minimum number is reached. Yochum Aff.

When the force management program was implemented in Yochum's directorate, there were a total of thirteen positions to be eliminated. In plaintiff's district manager universe, two positions were targeted for elimination. At the second-level universe, eleven positions were surplus. Both the district manager and second-level employee universes were banded. Yochum Aff., para. 5. Plaintiff was placed at risk and so advised. She was subject to separation from the company if other employees did not volunteer to leave. Of the ten district managers who were not subject involuntary termination, six were plaintiff's age or older, five were male and five were female. The only other district manager placed at risk was Maureen Tierney, a white female, age 47. Exh. 19. During the voluntary phase of downsizing, Maureen Tierney elected to leave the company rather than be terminated involuntarily. Yochum Dep. at 56–57. Plaintiff did not volunteer and thus was involuntarily terminated on January 27, 1989.

Yochum had previously advised plaintiff of her at-risk status by letter of November 15, 1988. Exh. 20. In that letter Yochum informed plaintiff that two volunteers were needed to avoid plaintiff's involuntary termination from employment. By follow-up letter of December 19, Exh. 21, Yochum advised plaintiff that she would be separated from the company involuntarily under the FMG unless she was able to secure another position within the company. By letter of December 22, Yochum repeated that the plaintiff's employment would be terminated if she failed to locate another AT & T position before January 27, 1989. Exh. 22. In that same letter Yochum warned plaintiff that taking vacation would seriously impair her chances to find another job with AT & T. Plaintiff admitted that she was given the opportunity to look for another job within the company. Gorham Dep. 4/20/90 at 92. Plaintiff admitted she did not try to locate another position within AT & T, *Id.* at 90–93, and, as notified, was separated from the company with a termination payment of $64,000. Gorham Dep. 1/16/90 at 10–11. From July 5, 1988, until at least the date of her last deposition, April 20, 1990, plaintiff had not made a single attempt to locate other employment. Gorham Dep. 4/20/90 at 103.

On September 2, 1988, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission and the New Jersey Division on Civil Rights, claiming age, race and sex discrimination and retaliation. On May 26, 1989, after investigation, the EEOC issued its determination, finding no basis to support the charge.

## DISCUSSION

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Brown v. Hilton*, 492 F.Supp. 771, 774 (D.N.J.1980). The burden of showing that no genuine issue of material fact exists rests initially on the moving party. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). This "burden ... may be discharged by 'showing' ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once a properly supported mo-

tion for summary judgment is made, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

There is no issue for trial unless the nonmoving party can demonstrate that there is sufficient evidence favoring the nonmoving party so that a reasonable jury could return a verdict in that party's favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510. In deciding a motion for summary judgment, the court must construe the facts and inferences in a light most favorable to the nonmoving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). The role of the court, however, is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511.

AT & T is entitled to summary judgment dismissing the claim brought pursuant to 42 U.S.C. § 1981 because, as a matter of law, § 1981 applies only to the making and enforcement of contracts. The court need not discuss this in detail, because plaintiff concedes that this is correct under the United States Supreme Court decision of *Paterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). Plaintiff's remaining claims are premised upon age discrimination under the ADEA and age, race and sex discrimination under the NJLAD.

ADEA and NJLAD claims feature a shifting burden of proof. In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the United States Supreme Court set forth the standards for Title VII cases. The Third Circuit has extended this approach to claims brought under the ADEA. *See Lockhart v. Westinghouse Credit Corp.,* 879 F.2d 43 (3d Cir.1989); *Massarsky v. General Motors Corp.,* 706 F.2d 111, 117 (3d Cir.1983), *cert. denied,* 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983). Likewise, the New Jersey courts have adopted the *McDonnell Douglas* rationale to establish a prima facie case under the NJLAD. *See Anderson v. Exxon Co., U.S.A.,* 89 N.J. 483, 492, 446 A.2d 486 (1982). Accordingly, the court will use these criteria to analyze plaintiff's claims of age, race and sex discrimination.

■ Under the *McDonnell Douglas* formula, a plaintiff must prove a prima facie case of discrimination by a preponderance of the evidence. Once plaintiff establishes her prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its actions. If the defendant succeeds in this burden, the plaintiff must then prove by a preponderance of the evidence that the legitimate reason(s) offered by the defendant were not its true reasons, but a pretext for discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824.

In proving her prima facie case of discrimination, the plaintiff must show:

(1) that she belongs to a racial minority;

(2) that she was qualified for the position she held;

(3) that, despite her qualifications, she was terminated; and

(4) that the employer replaced plaintiff with a nonminority or [as asserted by plaintiff in the instant case] retained a nonminority, similarly-situated employee while plaintiff was terminated.

Although plaintiff contends that, to establish a prima facie case of race discrimination, she need only show that similarly-situated nonminority employees were treated more favorably than she, this court must reject this. The key element missing from plaintiff's analysis is that she must show that she was otherwise qualified for that position and that she was laid off or fired from that job, for which she was qualified, while others not in that protected class were treated more favorably. *See Massarsky,* 706 F.2d at 118.

■ This court finds that plaintiff has failed to establish the second part of her prima facie case, i.e., that she was qualified for the position that she held. In support of its motion for summary judgment, the defendant has proffered deposition testimo-

ny and appraisal reports indicating that Gorham was discharged from AT & T because she was not performing her duties satisfactorily. The record clearly discloses that the plaintiff had not performed her job in 1988 to AT & T's satisfaction. The 1988 performance appraisal (Exh. 11), her admitted failure to carry out assigned tasks (Exh. 12 and 13; see also Gorham Dep. 1/24/90, pp. 81–84, 86), and the criticism of her work and capabilities by other employees at all levels (Exh. 9; see also Buehler Deposition, pp. 19–21) all demonstrate plaintiff's failure to satisfy the second stage of the prima facie case.

Plaintiff contends that her 1987 review shows she was performing satisfactorily. To evaluate whether plaintiff was performing satisfactorily, this court must examine the appraisals of plaintiff both as to work achieved and management capabilities. Although plaintiff's 1987 appraisal reflected an overall rating of "fully met expectations," the following comments were also contained in that appraisal:

> Developmental Action Plan—Because of the interaction difficulty with her subordinates it was not possible to get a good calibration of her capabilities as a manager. As mentioned in the Supervisor's comments, Ms. Gorham is highly motivated, enthusiastic and dedicated toward doing a quality job. She has demonstrated strong abilities as an individual contributor in the past. In order to properly assess her as a manager I believe she should be given another managerial assignment outside of Human Resources if possible.
>
> * * * * * *
>
> Aspects of Ms. Gorham's management style served as a source of conflict between her and members of her organization. This fact accounts for her reduced level of involvement in various levels of responsibility.

This appraisal thus indicated AT & T's concern about Gorham's problems with her subordinates and a consequential inability at that juncture to measure her managerial capabilities. Her next assignment was her professional demise.

Gorham sought Yochum's advice on her next career move in November of 1987, and in February 1988 she was assigned to Yochum's directorate. Yochum, having received negative feedback on Gorham's performance, "elected to give Joan additional direct supervision by having her report to Lex McCusker for additional assignments to groom her in her knowledge of Quality techniques." Exh. 14 at p. 4.

Plaintiff did not show improvement with this move into Yochum's group—her work drew "negative feedback from [Galvanek's] team—at all levels." Exhibit 9 shows:

> The feedback and analysis is:
>
> 1) Disorganization;
>
> 2) Limited "content preparation";
>
> 3) Poor business judgments;
>
> 4) Weak interpersonal skills;
>
> 5) Inaccurate view of contributions to the efforts/distorted view of personal effectiveness.

Exh. 9. Further, Lex McCusker reported on plaintiff's inability to complete projects, Exh. 10; and, in a June appraisal to Yochum, McCusker found Gorham's work below the level expected of an employee at her current salary grade in four key areas: written work, work planning, work management and judgment. McCusker wrote directly to plaintiff to ask her to make some improvements and spoke with her on the phone about feedback. After speaking with her, McCusker reported: "I find her performance on the assignment unacceptable and her response to my feedback insubordinate." Exh. 13. Her failure to meet the standards required in her new assignment, her consistent problems with subordinates and the failure to improve in 1988 all show that Gorham has failed to meet the second part of the prima facie case, *i.e.*, that she was performing satisfactorily at the time she was terminated.

Plaintiff has failed to give this court any evidence that would undermine the overwhelming documentation and evidence proffered by defendant that she was performing unsatisfactorily at the time of her termination from the company.

Unfortunately for plaintiff, her contention that she was not treated fairly because she was not told about her unsatisfactory performance or allowed the use of a consultant is irrelevant to her failure to show that she was performing unsatisfactorily. Such evidence might be relevant to the disposition of a claim for breach of implied contract contained in the employee manual, but fails to be relevant to a plaintiff's prima facie burden of showing discrimination. Accordingly, she has failed to meet her prima facie case of discrimination and as a matter of law this court rules that no material issues remain for trial and thus summary judgment is granted in favor of defendant. Plaintiff's complaint is dismissed.

No costs.